Erik Haas
Joshua A. Goldberg
Rachel B. Sherman
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 336-2000
Fax:  (212) 336-2222
ehaas@pbwt.com
jgoldberg@pbwt.com
rsherman@pbwt.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANTARCTICA STAR I, LP and ANTARCTICA STAR, LLC, <br><br> Plaintiffs, <br><br> - against - <br><br> GIBBS INTERNATIONAL, INC., <br><br> Defendant. | Index No. 15-cv-02630 (AT) <br><br> **AMENDED COMPLAINT** <br><br> **Jury Trial Demanded** |

Plaintiffs Antarctica Star I, LP and Antarctica Star, LLC (together "Antarctica Star"), by and through their undersigned attorneys, allege as follows:

**NATURE OF THE ACTION**

1. Antarctica Star brings this action for a declaration that Gibbs International, Inc. ("Gibbs") is not entitled to a closing fee with respect to a transaction that never closed and under a funding agreement that terminated when the transaction was abandoned.

2. The funding agreement was executed in anticipation of the closing of a transaction with the State of California (the "State") for the acquisition and lease of eleven State-

owned buildings (the "Transaction"). The Transaction was negotiated with the State by the principals of ACRE, LLC ("ACRE" and together with Antarctica Star, "Antarctica"). From 2009 through 2010, the principals of Antarctica worked around-the-clock to conduct due diligence on eleven properties the State offered for sale, to develop a proposal for the State, and to respond to the multiple rounds of bidding the State required as it honed down eligible participants. As part of this process, Antarctica arranged financing for the costs associated with effectuating the Transaction, and for the purchase of the properties. JP Morgan agreed to finance the bulk of the $2.33 billion purchase price. But JP Morgan demanded that Antarctica secure additional financing to fund the two deposits the State required before closing of the Transaction (totaling $55 million), and the working capital for the Transaction expenses. Gibbs agreed to provide that funding.

3. By a letter agreement with Antarctica Star dated November 3, 2010 (the "Funding Agreement"), Gibbs agreed to provide $1.2 million worth of working capital for the Transaction and to use its "best efforts" to procure the additional funds for the purchase price. In exchange for providing these services, Gibbs was entitled to receive a transaction fee (the "Fee"), which included flat payment and reimbursement for any capital advances made. Under the plain language of the Funding Agreement, Gibbs was entitled to the Fee *only if* the Transaction closed. The Funding Agreement explicitly provides that it terminates within a year if the Transaction does not close or is abandoned by the State. The deal was that Gibbs would be compensated—like Antarctica and other investors—only if the Transaction closed. All the sophisticated participants took the risk that the Transaction would not close.

4. The Funding Agreement also explicitly stated that Gibbs only was entitled to the Fee if Gibbs provided the specified services. Gibbs's commitments to provide the working

2

capital and procure the funds necessary to close obviously were material to the parties' agreement and the Transaction as a whole. Antarctica moved forward with the Transaction in reliance on Gibbs's commitments. Gibbs breached those commitments shortly after Antarctica secured a contract with the State.

5. On November 15, 2010 the State entered into a purchase and sale agreement (the "PSA") with the Antarctica affiliate California First, LP ("California First"). The PSA contemplated a closing on December 15, 2010, conditioned on the payment of the two deposits totaling $55 million. Gibbs made the initial deposit of $5 million and, as Antarctica advised the State, committed to provide the second deposit of $50 million. Gibbs also extended working capital of $500,000 for expenses incurred by JP Morgan in connection with the Transaction. Then Gibbs stopped performing. Gibbs did not provide the second deposit, and rejected additional requests for working capital—purportedly due to concerns that the Transaction would not close.

6. Gibbs's concerns derived from two events: First, on November 2, 2010, the day before the Funding Agreement was executed, Jerry Brown was elected to replace then-Governor Arnold Schwarzenegger. Second, on November 16, the day following the execution of the PSA, two former State employees commenced suit seeking to preclude the State from divesting its properties, despite the approval granted by the Legislature and Governor Schwarzenegger. Gibbs was concerned that the new Governor might abandon the Transaction if the suit delayed the closing for a matter of days until the new administration took over in 2011. However, regardless who was Governor, the State had no basis to avoid the Transaction—until Gibbs gave the State an argument by refusing to deposit the $50 million as represented.

7. Following Gibbs's breach of its commitment to fund the deposit, Antarctica Star scrambled to find alternative financing, which it did. Nonetheless, the closing of the Transaction was stayed, and soon after assuming the office, Governor Brown gave notice that the State had abandoned the Transaction. The primary basis the State provided for abandoning the Transaction was the failure to provide the timely deposit of the $50 million resulted in automatic termination of the PSA.

8. Within days of the State's announcement, Gibbs demanded that Antarctica Star immediately pay Gibbs the full Fee, including the reimbursement of certain working capital it had paid to JP Morgan to cover anticipated transaction expenses, which it would have received if the Transaction had closed (and not been terminated). Gibbs threatened suit if Antarctica Star did not immediately pay the amounts, which it claimed totaled $7.5 million. Importantly, Gibbs made this demand without regard to whether Antarctica Star had recovered, or could ever recover, any amounts from the State for its breach of contract.

9. Antarctica Star rejected Gibbs's interpretation of the Funding Agreement and demand. Under the plain terms of the agreement, Gibbs was not entitled to any amounts because (i) the State abandoned the Transaction, (ii) the Transaction never closed, and (iii) Gibbs did not perform but rather materially breached its commitments. With Antarctica Star having rejected Gibbs's demand, the dispute regarding the interpretation of the Funding Agreement was joined and ripe for adjudication.

10. Rather than proceed immediately to litigation, however, Antarctica Star proposed that Gibbs agree to defer their dispute to allow California First to bring suit against the State for specific performance of the Transaction, which if successful, would moot Gibbs's demand. Shortly thereafter, California First commenced suit against the State. Gibbs did not

provide any funding for the litigation or assist with the lawsuit in any way.  Instead, Gibbs continued to harass Antarctica Star for immediate payment under the Funding Agreement.

11. To avoid disruption with the litigation against the State, Antarctica Star entered into an agreement that tolled all of Gibbs's claims through 2012 (the "Tolling Agreement").  The thinking was that, if it were viable, specific performance would be ordered by 2012, and there would be nothing to fight about.  If no resolution was had by the end of 2012, either party could terminate the Tolling Agreement simply by providing notice, and the dispute would be revived.  The Tolling Agreement clearly states that Antarctica Star disputes the validity of Gibbs's demands.

12. The litigation with the State dragged on for years, through summary judgment and to trial in 2015.  The primary defense the State asserted throughout was that the delay in funding the $50 million deposit voided the Transaction.  Faced with that defense, and after years of incurring the costs of litigation, California First agreed to settle with the State for a fraction of the amount that would have been earned on the Transaction.

13. Unable to secure specific performance, and having incurred significant harm as a result, Antarctica Star terminated the Tolling Agreement by providing the requisite notice, which revived the parties' respective claims under the Funding Agreement.

14. To finally resolve the disputed interpretation of the Funding Agreement, Antarctica Star brings this declaratory judgment action for an order that Gibbs is not entitled to any Fee thereunder.  Antarctica Star further seeks damages resulting from Gibbs's refusal to comply with its funding commitments and provide the requisite working capital for the Transaction.

## THE PARTIES

15. Plaintiff Antarctica Star I, LP is a Delaware limited partnership and a citizen of New York and California, based on the citizenship of its partners. Antarctica Star I, LP's sole partners are Chandra Patel and Marvin Tien. Chandra Patel is an individual who is domiciled in New York, New York and who is a citizen of the State of New York. Marvin Tien is an individual who is domiciled in San Francisco, California and who is a citizen of the State of California.

16. Plaintiff Antarctica Star, LLC is a Delaware limited liability company and a citizen of New York and California, based on the citizenship of its members. Antarctica Star, LLC's sole members are Chandra Patel and Marvin Tien. Chandra Patel is an individual who is domiciled in New York, New York and who is a citizen of the State of New York. Marvin Tien is an individual who is domiciled in San Francisco, California and who is a citizen of the State of California.

17. Defendant Gibbs International, Inc. is a South Carolina corporation, with its principal place of business in Spartanburg, South Carolina.

## JURISDICTION AND VENUE

18. This Court has personal jurisdiction over Gibbs in this judicial district pursuant to the Federal Rules of Civil Procedure Rule 4(k)(1)(A), as Gibbs is subject to the jurisdiction of a court of general jurisdiction in the State of New York.  Moreover, Gibbs consented to and waived any objection to personal jurisdiction over it in this judicial district in the agreement at issue, expressly agreeing to "irrevocably and unconditionally submit to the exclusive jurisdiction of any state or Federal court sitting in New York County over any suit, action or proceeding arising out of or relating to this Agreement and the relationships created hereby."  (Funding Agreement, ¶ 13.)

19. This Court has subject matter jurisdiction over this declaratory judgment action under 28 U.S.C. § 1332(a)(1), based on the diversity of citizenship of the parties, and under 28 U.S.C. §§ 2201 and 2202, as a declaratory action.

20. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in this District. Moreover, Gibbs consented to and waived any objection to venue in this judicial district in the agreement at issue, expressly agreeing to "irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or proceeding brought in [any state or Federal court sitting in New York County] and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum or should be transferred."  (Funding Agreement, ¶ 13.)

## FACTUAL BACKGROUND

### A.   Antarctica Negotiates and Wins the Bid for the Transaction

21.   In 2009, then-Governor Schwarzenegger proposed that the State sell eleven State-owned buildings, under a sale-and-leaseback arrangement.  At the time, the State faced a significant budget deficit, and the Governor planned to use the funds from the sales to pay off debt on the properties and to add $1.2 billion to the State's general fund.  The Legislature approved and authorized the California Department of General Services ("DGS") to effectuate the sales.

22.   Throughout 2010, Antarctica negotiated with and made disclosures to the DGS and the brokerage firm it retained regarding the terms of a proposed transaction to acquire all eleven buildings for $2.33 billion.

23.   On October 11, 2010, the State announced that it had accepted and agreed to sell the eleven properties to an Antarctica affiliate, California First.  On November 15, 2010, the State entered into a Purchase and Sale Agreement ("PSA") to effectuate the sale with California First.  By its terms, the Transaction was to close on December 15, 2010.

24.   A condition of closing was that California First make two timely deposits into an escrow account; the first for $5 million and the second for $50 million, totaling $55 million.  (PSA § 2.1.1.)  The timely performance by California First in turn depended on the timely provision of funds from investors that had committed to finance the Transaction.  Gibbs committed to provide the timely deposits into the two escrow amounts.

### B.   Antarctica Star and Gibbs Enter Into the Funding Agreement

25.   Pursuant to the Funding Agreement dated November 3, 2010, Gibbs agreed to (i) provide Antarctica Star $5 million for the initial deposit, (ii) fund $1.2 million in working capital, (iii) use its "best efforts to procure funding for the Transaction," and (iv)

8

perform other agreed upon services (collectively, the "Services"). (Funding Agreement, ¶ 2(a).) In exchange, Gibbs was entitled to receive a fee equal to fixed amount ($ 3 million) plus reimbursement of the capital it had extended, once the Transaction closed.[1] (*Id.* at ¶ 3.)

26. By the plain terms of the Funding Agreement, Gibbs was entitled to the Fee only if (i) Gibbs provided the requisite Services, (ii) the Transaction closed, and (iii) the Transaction was not terminated by the State. (*Id.*, ¶¶ 3, 9.) Specifically, Section 3(a) of the Funding Agreement, titled "Compensation," states that Gibbs is entitled to a "Fee" if and "in the event [Gibbs] provides the Services." Moreover, the same section states that the Fee is payable only "following the Closing" of the Transaction.[2] For the avoidance of any doubt, Section 9, titled "Termination," states that the Funding Agreement "shall terminate automatically on the later of (i) the Closing and payment of the Fee, (ii) the abandonment of the Transaction by the Company and its affiliates or the State, and (iii) one year from the date hereof." (*Id.*, ¶ 9.) That section further identifies a number of provisions that survive termination of the Funding Agreement, but Section 3 (the Compensation section) is not one of them. (*Id.*)

27. As these plain terms reflect, Gibbs assumed the risk that it would not obtain a Fee if the Transaction did not close or was abandoned within a year following the execution of the Funding Agreement. Other investors and participants in the Transaction, including Antarctica Star, assumed the same risk. The deal was the participants obtained a return only if the Transaction closed. In addition, of course, Gibbs and the other participants had to provide the services they agreed to provide in order to receive any compensation.

---

[1] By letter agreement dated November 29, 2010, Gibbs agreed to provide an additional $5 million deposit, and the fixed amount of the Fee was increased from $3 million to $6 million.

[2] The "Closing Date" is defined as "the date that the Partnership consummates the Transaction." (Funding Agreement, ¶ 1.)

9

### C. Gibbs Agrees to Provide $50 Million Escrow Deposit

28. Gibbs committed in the Funding Agreement to use its best efforts to secure funding for the Transaction. Gibbs was unable to procure funding as the date approached to make the second deposit called for by the PSA. Accordingly, on November 18, 2010, Gibbs agreed to fund the second deposit, and authorized its agent to establish an account with the State's escrow agent to receive the $50 million. Later that day, in reliance on Gibbs's commitment, California First gave notice to the State that the funds would be transferred the next day. Gibbs never funded the escrow account.

### D. Gibbs Breaches its Commitments, Causing Antarctica Star Harm

29. Despite its agreement to do so, Gibbs did not deposit the $50 million with the State's escrow agent on November 19, 2010.

30. Similarly, after paying $500,000 to JP Morgan for expenses associated with the Transaction, Gibbs refused to comply with its agreement to fund working capital for the Transaction, repeatedly rejecting invoices for expense reimbursements. Antarctica Star was required to bear the costs Gibbs had agreed to cover.

31. Gibbs purportedly was concerned that the Transaction would not close. Its concern stemmed from two events. On November 2, 2010, Jerry Brown was elected Governor of the State of California for the term commencing January 2011. Thereafter, on November 16, 2010, the day after the PSA was executed, two former building commissioners that Governor Schwarzenegger had fired brought suit challenging the Transaction, and seeking a stay of the closing pending the resolution of the suit. Gibbs voiced concern that the Transaction would not close if the requests for the stay were successful, particularly if Governor Brown opposed the Transaction.

32. Gibbs's stated concern that the Transaction would not close was not a

10

legitimate basis to forego its contractual commitments.[3] Like the other Transaction participants, Gibbs willingly assumed the risk that the Transaction would not close.

33. Gibbs's breach of its commitments harmed Antarctica Star and the other Transaction participants. First, Gibbs's refusal to fund the working capital required for the Transaction required Antarctica Star to do so, which was not the deal. Second, Gibbs's failure to timely comply with its commitment to provide the $50 million escrow deposit gave the State grounds to assert that the PSA was void, depriving Antarctica Star of the benefit of its bargain.

E. **The State Refuses to Close and Abandons the Transaction**

34. The State did not close the Transaction on December 15, 2010, as contemplated by the PSA. By orders issued in the suit brought by the two former commissioners, dated December 13, 2010 and December 28, 2010, the closing of Transaction was temporarily stayed. Those stays afforded Governor Brown the opportunity to abandon the Transaction, which he did.

35. On February 9, 2011, DGS provided a formal notice that the State had abandoned the Transaction. On March 7, 2011, DGS affirmed the termination.

F. **The Abandonment of the Transaction Terminates the Funding Agreement**

36. As discussed, the plain language of the Funding Agreement provides that it is terminated automatically a year after its execution if the Transaction does not close or is abandoned by the State. As a consequence of the State's formal abandonment of the Transaction on February 9, 2011, it did not close, and the Funding Agreement terminated automatically.

37. Because the Funding Agreement was terminated without closing of the

---

[3] Indeed, after Governor Brown was elected and the two commissioners brought suit, Gibbs and Antarctica Star amended the Funding Agreement without making any changes to the termination provisions contained therein. With full knowledge of the imminent change in administration and pending litigation, they affirmed the full force and effect of those provisions.

11

Transaction, Gibbs was not and is not entitled to any Fee.

### G.   Gibbs Disputes the Termination of the Funding Agreement

38.   Shortly after the State formally abandoned the Transaction on February 9, 2011, Gibbs demanded payment of $7.5 million from Antarctica Star. The demand was made from Gibbs's counsel without any specification of a basis for the demand (because no legitimate basis exists). Gibbs threatened to file suit by March 4, 2011 absent payment of the demand.

39.   Notably, Gibbs made this demand before any suit was commenced seeking specific performance of the Transaction, discussed below. It was Gibbs's position that it was entitled to payment from Antarctica Star regardless whether the Transaction was abandoned or closed, and regardless whether any amounts were sought or recovered from the State for breach of the PSA.

40.   Antarctica Star rejected Gibbs's demand and steadfastly denied that any amounts were owed to Gibbs.

### H.   California First Commences the Litigation

41.   Thereafter, Antarctica endeavored to compel the State to comply with the PSA and close the Transaction.

42.   To that end, on March 10, 2011, California First commenced suit against the State (the "Litigation") seeking specific performance of the Transaction.

43.   Gibbs did not provide any funding for the Litigation, or assist with the Litigation in any way.

### I.   Antarctica Star and Gibbs Enter Into the Tolling Agreement

44.   While California First moved forward with the Litigation, Gibbs continued to harass Antarctica Star and threaten suit to recover the Fee under the Funding Agreement. Antarctica Star maintained throughout that Gibbs was not entitled to any Fee because the

Transaction did not close and the State had abandoned the Transaction. Absent an award of specific performance, therefore, Gibbs was not entitled to any amounts.

45. To allow it to focus on the Litigation, in November 2011, Antarctica Star entered into the Tolling Agreement with Gibbs. The Tolling Agreement precluded suit by either party, and provided a payment to Gibbs if the Litigation was resolved before December 31, 2012. Thereafter, either party could terminate the Tolling Agreement by notice to the other party. The reasoning was that, if specific performance was to be granted, it would be awarded quickly, Gibbs would be paid and the issue would be moot. But if the case lingered longer than 2012, the parties understood that specific performance was less likely.

46. The Tolling Agreement expressly states that "Antarctica disputes in its entirety, that Gibbs is entitled to a share of proceeds that may arise from certain litigation relating to the [Transaction]." (Tolling Agreement, Background, ¶ 2.)

### J.    The Litigation Continues for Years

47. The Litigation was not resolved by December 31, 2012, and specific performance of the Transaction was not ordered. Rather, the Litigation dragged out for years, until March 2015. Throughout this time, Antarctica pursued the Litigation at its own expense without any funding or assistance from Gibbs.

48. In the Litigation, through summary judgment and into trial, the State advanced as its primary basis for abandoning the Transaction the argument that the PSA was rendered void for failure to provide the timely deposit of $50 million. In other words, Gibbs's breach of its commitment gave the State its main defense.

49. After years of costly litigation, California First agreed to settle the Litigation for a fraction of the benefit it would have derived had the Transaction closed.

### K.      Antarctica Star Terminates the Tolling Agreement and Brings this Action

50.     When it became clear that the Litigation would settle without securing specific performance, Antarctica Star gave Gibbs notice of termination of the Tolling Agreement.

51.     Antarctica Star now brings this action to resolve this dispute regarding the terms of the Funding Agreement, and obtain recourse for Gibbs's breaches.

### CLAIM I

### Declaratory Judgment

52.     Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 50 as if fully set forth herein.

53.     A real and actual controversy exists as to Gibbs's entitlement to the Fee under the Funding Agreement.

54.     To clarify its rights under the law and avoid any uncertainty surrounding the amount due under the Funding Agreement, Antarctica Star seeks a declaratory judgment that Gibbs is not entitled to any amounts under the Funding Agreement.

### CLAIM II

### Breach of Contract

55.     Plaintiffs repeat and re-allege the allegations in Paragraphs 1 through 51 as if fully set forth herein.

56.     Gibbs breached its commitments to provide working capital for the Transaction, and to provide the deposit of $50 million required by the PSA.

57.     Antarctica Star has been damaged by Gibbs's breaches in an amount to be determined at trial but believed to be in excess of hundreds of millions of dollars.

**PRAYER FOR RELIEF**

WHEREFORE, Antarctica Star respectfully prays for the following relief:

A. For the entry of a declaratory judgment in favor of Antarctica Star and against Gibbs providing that Antarctica Star does not owe Gibbs any amounts under the Funding Agreement;

B. For damages for Gibbs's breach of the Funding Agreement in an amount to be determined at trial;

C. For the award of costs, expenses, disbursements, and reasonable attorneys' fees in an amount to be awarded at trial; and

D. Such other relief as the Court deems just and proper.

**JURY DEMAND**

Antarctica Star hereby demands trial by jury pursuant to the Federal Rules of Civil Procedure.

Dated: April 13, 2015

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP

By:    /s/ Erik Haas

Erik Haas
Joshua A. Goldberg
Rachel B. Sherman
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000
ehaas@pbwt.com
jgoldberg@pbwt.com
rsherman@pbwt.com

*Attorneys for Plaintiffs Antarctica Star I, LP and Antarctica Star, LLC*