USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: <u>February 14, 2017</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                            :

ANTARTICA STAR I, LP, et al.,            :

      Plaintiffs and Counterclaim Defendants,  :         15-cv-2630 (KBF)

                        -v-              :

GIBBS INTERNATIONAL, INC,         :         <u>OPINION & ORDER</u>

      Defendant and Counterclaim/Third-Party  :
                      Plaintiff,  :

                        -v-              :

ACRE, LLC, et al.,                  :

              Third-Party Defendants.  :
-------------------------------------------------------------------X
KATHERINE B. FORREST, District Judge:

      This dispute arises out of a failed multi-billion dollar property transaction with the State of California. The crux of the dispute is whether Gibbs International, Inc. ("Gibbs") is entitled to, *inter alia*, some portion of a settlement related to this failed transaction.

      In an agreement signed in the fall of 2010 (the "Funding Agreement"), plaintiffs and counterclaim defendants, Antarctica Star I, LP and Antarctica Star, LLC (jointly, "Antarctica"), agreed to pay Gibbs a fee in exchange for its assistance in securing funding for the purchase of eleven properties owned by the State of California (the "State"). The State ultimately abandoned the transaction and litigation between it and Antarctica-related entities ensued. Not to be left high and dry, Gibbs demanded that Antarctica pay it for services already provided under the

Funding Agreement.  Antarctica refused, maintaining that the State's abandonment of the transaction terminated any obligation under the Funding Agreement to pay Gibbs.  Instead of litigating this dispute immediately, however, the parties decided to toll their claims against each other while the suit against the State unfolded.  They entered into an agreement (the "Settlement Agreement") that included, *inter alia*, a provision whereby Gibbs would be paid a portion of any proceeds that resulted from that litigation.  That agreement also provided for a right to terminate after a certain period of time.  In 2015, when it became clear that the litigation with the State would settle, Antarctica terminated the Settlement Agreement.  Termination did not end Antarctica's dispute with Gibbs, however: Gibbs continued to press for payment.

In 2015, Antarctica brought a declaratory judgment and breach of contract action against Gibbs.  Gibbs counterclaimed against Antarctica and brought a third-party complaint against ACRE, LLC ("ACRE") and Chandra Patel.[1]  All claims are based on the question of whether Antarctica owes Gibbs payment under the Settlement Agreement or the Funding Agreement.  Antarctica has moved to dismiss Gibbs's counterclaims and third-party complaint.[2]

Ultimately, this Court finds the agreements unambiguous and not supportive of Gibbs's claims.  For the reasons stated below, Antarctica's motion is GRANTED.

---

[1] For convenience, the Court will refer collectively to counter- and third-party defendants as "Antarctica," unless it is necessary to specify.
[2] The Court converted this motion to one for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

I.      FACTUAL AND PROCEDURAL BACKGROUND[3]

A.      Procedural History

Antarctica Star I, LP and Antarctica Star, LLC commenced this action on April 3, 2015 and filed an amended complaint ten days later.  (Compl., ECF No. 2; Am. Compl., ECF No. 4.)  On May 10, 2016, Gibbs filed the operative counterclaims against plaintiffs and a third-party complaint against ACRE and Patel.  Gibbs brings claims for a declaratory judgment (Count One); breach of contract (Count Two); breach of the implied covenant of good faith and fair dealing (Count Three); unjust enrichment (Count Four); promissory estoppel (Count Five); breach of a third-party beneficiary contract (Count Six); alter ego and/or single enterprise and general partnership liability (Count Seven); fraudulent conduct (Count Eight); tortious interference (Count Nine); and civil conspiracy (Count Ten).  (Am. Countercl. & Third-Party Compl. ("Am. CC & TPC") ¶¶ 39-107, ECF No. 76.)

On May 31, 2016, Antarctica moved to dismiss both the amended counterclaims and third-party complaint.  (Mot. Dismiss, ECF No. 79.)  That motion was fully submitted as of June 27, 2016.  (Reply, ECF No. 85.)  On November 22, 2016, this case was transferred from the Honorable Analisa Torres to the undersigned.  On December 6, 2016, the Court informed the parties that it intended to resolve the motion to dismiss as a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  (Order, ECF No. 95.)  Pursuant to that

---

[3] The following facts are taken from Gibbs's amended counterclaims and third-party complaint, along with the various agreements referenced by and incorporated therein.  *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).  The Court here recounts only those facts relevant to resolving the pending motion.

order, the parties filed supplemental briefs.  (Antarctica Suppl. Br., ECF No. 96; Gibbs Suppl. Br., ECF No. 97.)

     B.   <u>Factual History</u>

In an attempt to reduce the State's budget shortfall, California's Department of General Services ("CDGS") contracted to sell to and lease back from California First, LP and California First, LLC (collectively, "California First" or the "California First entities") eleven state-owned properties for $2.33 billion (the "Golden State transaction" or "transaction").  (Am. CC & TPC ¶¶ 8, 9.)  The California First entities, which are controlled by ACRE and Patel, were created for the purpose of acquiring the state-owned properties.  (*Id.* ¶ 10.)  Antarctica Star I, LP and its general partner, Antarctica Star, LLC, were responsible for implementing the Golden State transaction.  (*Id.*)  California First and CDGS entered into a Purchase and Sale Agreement ("PSA") on November 15, 2010.  (*Id.* ¶ 9; Sherman Decl. Ex. 2, ECF No. 80-2.)

     *i.*   *The Funding Agreement*

Antarctica contracted with Gibbs to help fund the Golden State transaction (the "Funding Agreement").  (Am. CC & TPC ¶¶ 14-15, 20, 22.)  The terms of the Funding Agreement are contained in a letter agreement between Antarctica and Gibbs dated November 3, 2010, (Sherman Decl. Ex. 1 ("Funding Agreement"), ECF No. 80-1), which was amended on November 29, 2010, (*id.* Ex. 3 ("Funding Agreement Amendment"), ECF No. 80-3).  Under the Funding Agreement, Gibbs agreed to (i) provide two deposits of $5 million each, (ii) provide $1.2 million in

working capital, the availability of which was subject to a November 15, 2010 "Working Capital Letter,"[4] (iii) use its best efforts to procure funding for the transaction, and (iv) provide any other services that may be agreed upon.  (Am. CC & TPC ¶¶ 14, 20; Funding Agreement § 2; Funding Agreement Amendment 1.)  In the event Gibbs provided these services, Antarctica agreed to pay Gibbs "no later than one business day" following the Golden State transaction's closing an amount equal to (i) Gibbs's deposits, (ii) a $6 million fee, (iii) the amount of working capital Gibbs advanced, and (iv) two times the amount of working capital provided by Gibbs (with the sum of the amounts in (ii) and (iv) constituting Gibbs's "fee"), along with a membership interest in Antarctica Star, LLC.  (Funding Agreement § 3; Funding Agreement Amendment 2; Am. CC & TPC ¶¶ 15, 22.)

The Funding Agreement also included a termination provision.  Pursuant to this provision, the Agreement would terminate automatically "on the later of" (i) the closing of the Golden State transaction and the payment of Gibbs's fee, (ii) the abandonment of the Golden State transaction by Antarctica or the State, "and (iii) one year from the date hereof."  (Funding Agreement § 9.)  The California First entities are not party to the Funding Agreement.

---

[4] The Working Capital Letter provides that, "[n]otwithstanding the terms and conditions of the [Funding] Agreement or otherwise, in the event the Golden State Transaction is terminated for any reason; (a) [Antarctica] will be obligated to Gibbs for the prompt return of, and shall return, all amounts of Working Capital previously released by Gibbs to, or to any third party on behalf of, [Antarctica] and (b) with respect to any Working Capital funds remaining in any accounts controlled by [Antarctica] at the time of such termination, [Antarctica] will have no right or title to such remaining Working Capital funds and such remaining Working Capital Funds shall be immediately returned to Gibbs by wire transfer."  (Boozer Decl. Ex. 6 ("Working Capital Letter"), ECF No. 41-6; *see also* Am. CC & TPC ¶ 18.)

On or about November 3, 2010, Gibbs wired the first $5 million deposit.  (Am. CC & TPC ¶ 16.)  On or about November 17, 2010, Gibbs wired $500,000 in working capital.  (*Id.* ¶ 19.)  Gibbs requested additional information and documentation for additional expenses before it provided the balance of the working capital, but Antarctica refused to comply with the request.  (*Id.*)  On or about November 29, 2010, Gibbs wired the second $5 million deposit.  (*Id.* ¶ 21.)

### ii.   *California First Litigation*

On or about February 9, 2011, the State gave notice that it would not proceed with the Golden State transaction.  (*Id.* ¶ 24.)  On March 3, 2011, California First, ACRE, and Patel entered into an agreement (the "Facilitation Agreement") pursuant to which they agreed to cooperate in suing CDGS over its decision to terminate the transaction.  (*Id.* ¶¶ 25, 26; Sherman Decl. Ex. 6 ("Facilitation Agreement"), ECF No. 80-6.)  The Facilitation Agreement provided that, should "ACRE or any of its affiliates . . . provide proof of funds in the amount of $1 billion," and the litigation resulted in settlement or specific performance by the State, California First would pay ACRE $2 million and certain expenses.  (Facilitation Agreement §§ 6, 8; *see also* Am. CC & TPC ¶ 26.)  On or about March 10, 2011, California First filed a lawsuit seeking to compel CDGS to go through with the Golden State transaction (the "California First litigation").  (Am. CC & TPC ¶ 27.)

### iii.   *The Settlement Agreement*

At some point, Gibbs made a demand for payment, including but not limited to the $500,000 in working capital Gibbs had provided; Antarctica refused its

demand.  (*Id.* ¶ 28.)  Instead of immediately litigating their dispute, however, the parties entered into an agreement dated November 23, 2011 to toll the statute of limitations on claims against each other (the "Settlement Agreement").[5]  (*Id.* ¶ 29; Sherman Decl. Ex. 5 ("Settlement Agreement"), ECF No. 80-5.)

The Settlement Agreement states that Gibbs had asserted, and Antarctica had disputed, that it "[was] entitled to a share of proceeds that may arise from" the California First litigation.  (Settlement Agreement at Background.)  The parties agreed to resolve these disagreements by automatically releasing any claims against each other, including those related to their prior agreements and the California First litigation, (*id.* § 2(c), (d)), should Gibbs receive $500,000 or more pursuant to the terms of a concurrently executed Escrow Agreement, (*id.* § 2).  If, however, Gibbs was not paid and the mutual releases did not become effective by December 31, 2012, then either party could "void" the Settlement Agreement through written notice.  (*Id.*)

The Escrow Agreement—entered into by Gibbs, Antarctica Star I, LP, ACRE, and Patel—provided that proceeds from a settlement that would otherwise be payable to ACRE under the Facilitation Agreement would instead be paid to an escrow agent, who would then disburse a certain percentage of those proceeds to Gibbs under a "waterfall payment formula."  (*Id.* § 1(a); *id.* Annex A ("Escrow Agreement") §§ 1(c), 4; *id.* Annex C ("Amended Facilitation Agreement"); Am. CC &

---

[5] The parties defined as "Antarctica" in the Settlement Agreement include Antarctica Star I, LP, Patel, and ACRE.

TPC ¶ 46.)  The Escrow Agreement, the Facilitation Agreement, and the amendment to the Facilitation Agreement that identified the escrow account into which any amounts payable to ACRE would be deposited were all attached as annexes to the Settlement Agreement.  None contains terms purporting to alter the termination provision in the Settlement Agreement; and none contains terms purporting to require payment to Gibbs in the event of the Settlement Agreement's termination.

<em>iv.    Settlement</em>

When it became clear that the California First litigation would settle, Antarctica purported to terminate the Settlement Agreement.  (Am. CC & TPC ¶¶ 35, 84, 88.)  This occurred before June 19, 2015.  On or about June 19, 2015, the California First litigation was dismissed, CDGS paid California First $24 million, and part of that payment went to Antarctica.  (*Id.* ¶ 35.)  None of those proceeds has been deposited into the escrow account, and Gibbs has not received any portion of the settlement.  (*Id.* ¶¶ 30, 35.)

By this point, approximately two-and-a-half years had passed since the termination provision of the Settlement Agreement became effective.  Indeed, Gibbs had been on notice since January 1, 2013 that Antarctica could terminate the agreement at any time, and there is no evidence to suggest that Gibbs had tried to renegotiate this provision.

## II.   LEGAL PRINCIPLES

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001).  The court must accept as true all factual allegations contained in the complaint and draw all reasonable inferences in the non-moving party's favor.  *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010).  "To survive a Rule 12(c) motion, the complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

"On a 12(c) motion, the court considers 'the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case.'"  *L-7 Designs, Inc.*, 647 F.3d at 422 (quoting *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009)).  A complaint is "deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint."  *Id.* (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)).

III.   ANALYSIS

Gibbs has brought a number of claims against Antarctica, all turning on the essential contention that Antarctica has improperly withheld proceeds from the settlement to which Gibbs is entitled.  For the reasons stated below, Gibbs's claims fail.

A.   Count Two: Breach of Contract

In order to state a claim for breach of contract under New York law, a plaintiff must allege: "(1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach."  Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525 (2d Cir. 2004).  Here, the parties do not dispute that the Funding and Settlement Agreements were valid contracts.  The question is whether either was breached.

i.   *Funding Agreement*

In Count Two, Gibbs alleges that, pursuant to the Settlement Agreement and the related documents, it was entitled to a portion of the settlement proceeds from the California First litigation.  Thus, as an initial matter, although it recites the facts and circumstances underlying the Funding Agreement, Gibbs has not actually pleaded—including in the proposed Second Amended Counterclaims and Third-Party Complaint attached to its supplemental brief, (*see* Gibbs Suppl. Br. Ex. A, ECF No. 97-1)—that Antarctica breached the Funding Agreement.  Even if it had, however, that claim would fail.

The Funding Agreement clearly contemplated that Gibbs would be paid only if the Golden State transaction went through.  Section 3 states that, in the event Gibbs provided the required services, Antarctica would pay Gibbs "no later than one business day following the Closing."  (Funding Agreement § 3.)  The "Closing Date" was defined as the date on which California First "consummates the Transaction," and the "Transaction" was defined as the "acquisition" of the CDGS-owned properties.  (*Id.* § 1, Introduction.)  The Funding Agreement clearly assumed that the closing of the Transaction would trigger payment to Gibbs; there is no dispute that no such closing occurred.

Even if the "no later than" language did not mean that Gibbs was to be paid *only* if there was a closing, the Funding Agreement is no longer operative.  The termination provision provides that the Agreement terminates automatically "on the later of (i) the Closing and the payment of the Fee, (ii) the abandonment of the Transaction by [Antarctica] and its affiliates or the State, and (iii) one year from the date hereof."  (*Id.* § 9.)  Again, it is undisputed that the closing never occurred.  Instead, the Golden State transaction was abandoned by the State in February 2011.  (Am. CC & TPC ¶ 24.)  And, finally, since the Funding Agreement was executed on November 3, 2010, the one-year period expired on November 3, 2011.  When the parties entered into the Settlement Agreement on November 23, 2011,

the Funding Agreement had already expired by its own terms.[6]  Accordingly, the

Funding Agreement terminated prior to the triggering of any payment event.  Thus,

Antarctica did not breach the Funding Agreement by not paying Gibbs.[7]

        *ii.*     *Settlement Agreement*

In Count Two, Gibbs has alleged that Antarctica breached the Settlement

Agreement.  That agreement, read in concert with the Escrow and amended

Facilitation Agreements, required Antarctica to distribute to Gibbs proceeds from

the $24 million settlement with CDGS.  (Am. CC & TPC ¶¶ 44-48.)  This claim,

however, must also be dismissed: Antarctica was entitled to, and did, terminate the

Settlement Agreement prior to a payment obligation attaching.

Gibbs alleges that, when it became clear that the California First litigation

would settle, Antarctica purported to terminate the Settlement Agreement.[8]  (*See,*

*e.g.*, *id.* ¶ 88 ("Plaintiffs/Third-Party Defendants consummated their fraudulent

conduct when they purported to terminate the November 23, 2011 Settlement

Agreement as soon as Plaintiffs/Third-Party Defendants learned that the California

First Litigation would most likely result in a settlement without specific

---

[6] Although the parties contracted for several sections of the Funding Agreement to survive its termination, the provision that addressed Gibbs's compensation—Section 3—was not one of them. (Funding Agreement § 9.)

[7] The Court also notes that Gibbs has not alleged that Antarctica breached the November 15, 2010 Working Capital Letter, which provided that, "[n]otwithstanding the terms and conditions of the [Funding] Agreement or otherwise, in the event the Golden State Transaction is terminated for any reason . . . [Antarctica] will be obligated to Gibbs for the prompt return of, and shall return, all amounts of Working Capital previously released by Gibbs to, or to any third party on behalf of, [Antarctica]."  (Working Capital Letter 1-2.)

[8] Gibbs does not include in its amended counterclaims and third-party complaint the precise date Antarctica purportedly terminated the Settlement Agreement.  However, it is clear from the allegations that Gibbs is alleging that it occurred at some point prior to when CDGS paid California First $24 million.

performance.").)  On or about June 19, 2015, CDGS paid California First $24 million, and part of that payment went to Antarctica.  (*Id.* ¶ 35.)  Gibbs has not received any portion of the settlement.  (*Id.* ¶¶ 30, 35.)

The breach of contract claim with respect to the Settlement Agreement comes down to whether Gibbs was entitled to proceeds from the settlement when the State and California First agreed to its terms, as Gibbs argues, or only once Gibbs was paid, as Antarctica contends.  This issue is resolved by the plain language of the Settlement Agreement.  By its terms, the mutual releases of the Settlement Agreement became operational only when Gibbs received distributions, and not when any right to payment accrued.  (Settlement Agreement § 2 ("The releases and covenants not to sue . . . will become effective automatically without the need for further action immediately upon [Gibbs] *receiving distributions* of $500,000 or more." (emphasis added)).)  If Gibbs did not receive any distributions by December 31, 2012—and it is undisputed that it did not—any party could automatically void the Agreement by giving written notice.  (*Id.*)  Although the Escrow Agreement does not contain a termination provision, it was executed "[i]n accordance with the Settlement Agreement," (Escrow Agreement 1), and does not instill in Gibbs any rights above and beyond the Settlement Agreement.  Further, Gibbs admits that "[t]he sole purpose of the Amendment [to the Facilitation Agreement] was to put into effect the Settlement and Escrow Agreements, obligating California First to pay any proceeds from the Litigation that would otherwise be payable to a Patel entity to the escrow agent named in the Escrow Agreement for distribution to

13

Gibbs." (Resp. Opp'n 8, ECF No. 83.) Any payment to Gibbs under the amended Facilitation Agreement, therefore, was also dependent on its rights under the Settlement Agreement.

Gibbs alleges that Antarctica terminated the Settlement Agreement after December 31, 2012 but before CDGS paid California First $24 million. (*See, e.g.*, Am. CC & TPC ¶ 88.) Accordingly, the termination was within the contract's parameters. Indeed, beginning January 1, 2013, Gibbs was on notice that Antarctica could have terminated the Settlement Agreement at any time, just as Gibbs could have. If this arrangement was not to Gibbs's liking, it could have used any leverage it possessed during the approximately two-and-a-half years before Antarctica took action to renegotiate this provision.

Antarctica's motion to dismiss Gibbs's breach of contract claim is granted.

B.   Count Three: Breach of the Implied Covenant of Good Faith and Fair Dealing

Generally, under New York law, a cause of action alleging breach of the implied covenant of good faith and fair dealing is duplicative of a cause of action alleging breach of contract. *See Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015). "[A] claim for breach of the implied covenant can survive a motion to dismiss only 'if it is based on allegations different than those underlying the accompanying breach of contract claim' and if the relief sought is not 'intrinsically tied to the damages allegedly resulting from the breach of contract.'" *In re Refco Inc. Secur. Litig.*, 826 F. Supp. 2d 478, 496 (S.D.N.Y. 2011) (quoting *Ari and Co., Inc. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518,

521-22 (S.D.N.Y. 2003)).  Furthermore, "the implied covenant of good faith cannot create duties that negate explicit rights under a contract."  *LJL 33rd St. Assocs., LLC v. Pitcairn Props. Inc.*, 725 F.3d 184, 195 (2d Cir. 2013); *see also Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983) ("No obligation [of good faith and fair dealing] can be implied, however, which would be inconsistent with other terms of the contractual relationship.").

Gibbs alleges that Antarctica's termination of the Settlement Agreement was a violation of the covenant of good faith and fair dealing.[9]  Antarctica and Gibbs, sophisticated parties who consulted with counsel regarding the legal effect of the Settlement Agreement, (*see* Settlement Agreement § 2(h)), specifically agreed that either party could automatically terminate the Agreement by written notice if Gibbs was not paid and the mutual releases did not become effective by December 31, 2012, (*id.* § 2).  The language of the termination clause is unqualified.  Accordingly, to imply an obligation of good faith and fair dealing would directly contradict the flexibility the parties contracted for themselves.  As stated above, Gibbs had almost a year and a half before Antarctica invoked the termination provision during which it could have sought to renegotiate the Settlement Agreement.  Antarctica's actions may have been sharp business practices, but they were not a breach of the covenant of good faith and fair dealing.  Antarctica's motion to dismiss this claim is granted.

---

[9] Although Gibbs's amended counterclaims and third-party complaint do not specify what Antarctica did to violate the covenant, Gibbs's arguments in its opposition brief relate only to the termination of the Settlement Agreement.  (Resp. Opp'n 11, 13-14.)

C.     Count Four: Unjust Enrichment

Under New York law, a plaintiff seeking damages

for unjust enrichment must allege (1) that the defendants were enriched or

benefitted, (2) at plaintiff's expense, and (3) that equity and good conscience require

restitution. *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 519 (2d Cir. 2001). "The

'essence' of such a claim 'is that one party has received money or a benefit at the

expense of another.'" *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir.

2000) (quoting *City of Syracuse v. R.A.C. Holding, Inc.*, 685 N.Y.S.2d 381, 381 (N.Y.

App. Div. 1999)). "An unjust enrichment claim is not available where it simply

duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon*

*N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012).

As an alternative to its contractual claims, Gibbs alleges that Antarctica was

unjustly enriched by its failure to distribute a portion of the California First

litigation settlement proceeds to Gibbs.  (Am. CC & TPC ¶¶ 58-60.)  This claim is

duplicative of Gibbs's breach of contract claim, which similarly alleges that

Antarctica breached the Settlement Agreement by failing to distribute to Gibbs a

portion of the $24 million it received from CDGS.  Gibbs's unjust enrichment claim

"cannot remedy the defects" of its breach of contract claim. *Corsello*, 967 N.E.2d at

1185. Accordingly, it is dismissed.

D.     Count Five: Promissory Estoppel

Also as an alternative to its contractual claims, Gibbs brings a claim for

promissory estoppel.  (Am. CC & TPC ¶ 65.)  In particular, Gibbs claims that,

16

despite its promise to pay, Antarctica has refused Gibbs a portion of the settlement proceeds from CDGS.  (*Id.* ¶¶ 66-69.)

"A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance."  *Kaye*, 202 F.3d at 615.  As a quasi-contractual claim, "promissory estoppel generally applies only in the absence of a valid and enforceable contract."  *Kwon v. Yun*, 606 F. Supp. 2d 344, 368 (S.D.N.Y. 2009).  There is no dispute that the Funding and Settlement Agreements are valid and enforceable contracts; Gibbs only disputes whether they were terminated properly.[10] Accordingly, Antarctica's motion to dismiss this claim is granted.

E.   Count Six: Breach of Third-Party Beneficiary Contract

Gibbs alleges that it was a third-party beneficiary of the Facilitation Agreement, as amended to reflect the Escrow and Settlement Agreements, and therefore is entitled to receive a portion of the settlement proceeds.  (Am. CC & TPC ¶¶ 73, 74.)  Under the Facilitation Agreement, California First, ACRE, and Patel agreed to cooperate to sue CDGS over its decision to terminate the Golden State transaction.  The Facilitation Agreement as it was originally signed provided that California First would pay ACRE $2 million if the litigation resulted in settlement

_____

[10] In its opposition brief, Gibbs argues that there is a dispute over the scope of the Facilitation Agreement, entitling it to plead quasi-contract claims.  (Resp. Opp'n 17-18.)  But in its promissory estoppel claim, Gibbs's only mentions its entitlement to any proceeds under the Settlement Agreement.  This makes sense; as the Court will discuss in further detail, the Facilitation Agreement's purpose was to outline the cooperation among California First, ACRE, and Patel for the California First litigation.

or specific performance by the State.  (Facilitation Agreement § 6.)  It was amended on November 28, 2011 to reflect that any amounts payable to ACRE would be disbursed to the account identified in the Escrow Agreement.  (Amended Facilitation Agreement § 2.)  Gibbs is nowhere mentioned in the Facilitation Agreement or the amendment thereto.

Under New York law, a party asserting rights as a third-party beneficiary must establish: "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost." *State of Cal. Pub. Emps.' Ret. Sys. v. Shearman & Sterling*, 741 N.E.2d 101, 104 (N.Y. 2000). "To create a third party right to enforce a contract, 'the language of the contract' must '*clearly* evidence[ ] an intent to permit enforcement by the third party[.]'" *Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 528 (2d Cir. 2005) (alterations in original) (quoting *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 485 N.E.2d 208, 212 (N.Y. 1985)).

Here, Gibbs has not plausibly alleged that it was an intended third-party beneficiary of the Facilitation Agreement.  The primary purpose of the Facilitation Agreement was to define the cooperation between California First, ACRE, and Patel in the lawsuit against CDGS.  This in itself establishes that any benefit to Gibbs under the Facilitation Agreement was, at most, incidental.  *See Mademoiselle Knitwear, Inc. v. Liz Claiborne, Inc.*, No. 98 Civ. 3252, 1999 WL 377853, at *10

(S.D.N.Y. June 9, 1999) ("To the extent that the two agreements may have guaranteed the plaintiff certain levels of production—and perhaps profits—[plaintiff] was no more than an incidental beneficiary of these agreements and has no ability to enforce them.").  Furthermore, as Antarctica points out, the amendment to the Facilitation Agreement was solely a mechanism for effectuating the Settlement Agreement and the related Escrow Agreement.  Indeed, for Gibbs to accrue any benefits under the amended Facilitation Agreement, it would first have to be entitled to compensation under the Settlement and Escrow Agreements, which the Court already has determined were properly terminated.  (Am. CC & TPC ¶ 74(A)-(E); Escrow Agreement 1 ("*In accordance with the Settlement Agreement*, Gibbs and Antarctica desire for Escrow Agent to receive, hold, and disburse certain funds and property in accordance with this Agreement." (emphasis added)).)  The fact that any benefit accorded to Gibbs under the amended Facilitation Agreement was conditional supports the Court's finding that Gibbs was, at most, an incidental beneficiary.  Accordingly, because the Facilitation Agreement as amended "does not contain an express provision identifying [counterclaimant] as an intended third-party beneficiary" or "otherwise reveal a specific intent to confer a benefit upon [counterclaimant] or permit [counterclaimant] to enforce the contract terms," Gibbs's claim for breach of a third-party beneficiary contract is dismissed.  *Conklin v. City of Saratoga Springs*, 699 N.Y.S.2d 820, 821 (N.Y. App. Div. 1999).

F.      Count Eight: Fraudulent Conduct

Gibbs alleges that Antarctica fraudulently lured it into signing the
Settlement Agreement in an attempt to keep Gibbs from bringing suit when, in fact,
Antarctica had no intention of performing its responsibilities under the Settlement
Agreement.  (Am. CC & TPC ¶¶ 87, 88, 89; *see also id.* ¶ 84.)  In particular, Gibbs
alleges that Antarctica only executed the Settlement Agreement to keep Gibbs from
suing and to prevent Gibbs from "derailing" the California First litigation, (*id.*
¶¶ 84, 89, 91), and that Antarctica intended to terminate the Settlement Agreement
as soon as it became clear the litigation most likely would settle, (*id.* ¶¶ 84, 88).

To state a claim for fraud under New York law, a party must allege material
misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance,
justifiable reliance by the plaintiff, and damages.  *See Eurycleia Partners, LP v.
Seward & Kissel, LLP*, 910 N.E.2d 976, 979 (N.Y. 2009). "It is black letter law in
New York that a claim for common law fraud will not lie if the claim is duplicative
of a claim for breach of contract."  *EQT Infrastructure Ltd. v. Smith*, 861 F. Supp.
2d 220, 233 (S.D.N.Y. 2012).  To maintain a separate claim for fraud that does not
merge with a breach of contract claim, a party must "(1) demonstrate[] a legal duty
separate from the duty to perform under the contract; (2) point[] to a fraudulent
misrepresentation that is collateral or extraneous to the contract; or (3) seek[]
special damages that are unrecoverable as contract damages."  *Merrill Lynch & Co.
v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007).  With respect to
collateral or extraneous fraudulent misrepresentations, "New York distinguishes

20

between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement." *Id.* at 184.

Gibbs's fraud claim merges with its breach of contract claim. First, Gibbs does not allege that Gibbs had any legal duty apart from those under the agreements. Second, even if they met the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which they do not, Gibbs's allegations that Antarctica made fraudulent misrepresentations when it agreed that Gibbs would partake in any proceeds resulting from the California First litigation, and when it omitted that its underlying intentions were to thwart Gibbs's efforts to enforce its rights under the Funding Agreement, constituted promissory statements of what would be done in the future that are not collateral or extraneous to the contract. Third, Gibbs has not sought "special damages that are unrecoverable as contract damages," since "[a] general request for punitive damages is not enough to differentiate the damages recoverable for fraud from those sought for breach of contract." *Russell Publ'g Grp., Ltd. v. Brown Printing Co.*, No. 13 Civ. 5193, 2014 WL 1329144, at *3 (S.D.N.Y. Apr. 3, 2014) (first quoting *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007), and then quoting *Sekisui Am. Corp. v. Hart*, No. 12 Civ. 3479, 2012 WL 5039682, at *3 (S.D.N.Y. Oct. 17, 2012)); *see also Krantz v. Chateau Stores of Canada Ltd.*, 683 N.Y.S.2d 24, 25 (N.Y. App. Div. 1998).

In all events, the language of the Settlement Agreement itself precludes Gibbs's argument that Antarctica lied.  First, the Settlement Agreement explicitly stated that Antarctica disputed Gibbs's rights to any proceeds from the California First litigation.  (Settlement Agreement at Background ("Certain disagreements have arisen between Gibbs and Antarctica Star with respect to the Prior Agreements [e.g., the Funding Agreement] . . . , including the assertion by Gibbs, *which Antarctica disputes in its entirety*, that Gibbs is entitled to a share of proceeds that may arise from certain litigation relating to the Golden State Transaction." (emphasis added)).)  Second, the parties explicitly provided they "desire[d] to resolve the disagreements between them" by executing an agreement that, by its terms, prevents either party from suing the other until 2013.  (*Id.*)  Having signed the Settlement Agreement and acknowledged that it received independent legal advice from counsel, (*id.* § 2(h)), Gibbs cannot plausibly argue that it was unaware that (i) Antarctica disputed Gibbs's rights to the settlement proceeds, (ii) the explicit purpose of the Settlement Agreement was to toll any claims that Gibbs was threatening to litigate, and, importantly, (iii) either party could terminate the Agreement after 2012, *see Paraco Gas Corp. v. Travelers Cas. and Sur. Co. of Am.*, 51 F. Supp. 3d 379, 393 (S.D.N.Y. 2014) (A party "cannot claim reliance on a misrepresentation when he or she could have discovered the truth with due diligence.").  Finally, in terms of damages, Gibbs has not explained how it was harmed by its inability to "pursue prompt payment from Antarctica under the Funding Agreement."  (Resp. Opp'n 28.)  Its entitlement to any proceeds from the

California First litigation always was contested by Antarctica, and it has not lost its opportunity to sue to enforce the Funding Agreement.  Accordingly, Gibbs's fraud claim is dismissed.

      G.    Count Nine: Tortious Interference

Under Count Nine, Gibbs alleges that Antarctica Star I, LP and Antarctica Star, LLC intentionally and improperly caused ACRE, Patel, and California First to not pay Gibbs the agreed portion of the proceeds from the settlement and, therefore, to breach the Facilitation Agreement, as amended.  (Am. CC & TPC ¶ 101.)  Under New York law, this claim requires "the existence of [a] valid contract with a third party, defendant's knowledge of that contract, defendant's intentional and improper procuring of a breach, and damages." *White Plains Coat & Apron Co. v. Cintas Corp.*, 867 N.E.2d 381, 383 (N.Y. 2007).  The Court already has established that Gibbs was not entitled to any portion of the settlement proceeds.  Accordingly, Count Nine is dismissed.

      H.    Counts Seven and Ten: Alter Ego and/or Single Enterprise Liability, and Civil Conspiracy

Gibbs's claims for alter ego liability (Count Seven), and civil conspiracy (Count Ten) are contingent on other claims surviving.  (*See* Am. CC & TPC ¶ 82 ("Each of the Plaintiffs/Third-Party Defendants is also liable for the conduct described in this complaint based on alter ego and/or single enterprise liability, as well as general partnership liability as referenced herein."); *id.* ¶ 104 (alleging that the parties worked together to avoid paying Gibbs the money to which it was entitled).)  As the Court has determined than none of Gibbs's other claims survives

Antarctica's motion for judgment on the pleadings, Gibbs's alter ego and civil conspiracy counts so too fail.  *See, e.g.*, *Network Enters., Inc. v. Reality Racing, Inc.*, No. 09 Civ. 4664, 2010 WL 3529237, at *4 (S.D.N.Y. Aug. 24, 2010) ("Under New York law, the alter ego doctrine is not recognized as an independent cause of action."); *Hebrew Inst. for Deaf & Exceptional Children v. Kahana*, 870 N.Y.S.2d 85, 86 (N.Y. App. Div. 2008) ("New York does not recognize civil conspiracy to commit a tort as an independent cause of action; rather, such a claim stands or falls with the underlying tort." (internal citation omitted)).  Accordingly, Counts Seven and Ten are dismissed.

I.    Count One: Declaratory Judgment

Gibbs seeks a declaratory judgment that (1) Antarctica is not entitled to any recovery from Gibbs, and (2) Gibbs is entitled to recover under its other counter- and third-party claims.  (Am. CC & TPC ¶ 41.)   The Second Circuit has held that, in order to decide whether to entertain an action for declaratory judgment, a District Court must ask: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade Inc. v. St. Paul Fire and Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005).  Whether to exercise declaratory jurisdiction is within the district court's broad discretion. *See Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 407 (S.D.N.Y. 2010).

For the reasons stated above, the Court already has found that Gibbs is not entitled to recover under its other claims.  In terms of a declaratory judgment

regarding whether Antarctica is entitled to recover from Gibbs, Gibbs has not alleged sufficient facts that would allow the Court to make a determination on this issue at this time. (*See* Resp. Opp'n 6; Am. CC & TPC ¶¶ 16, 19, 21.) Accordingly, the Court declines to exercise its declaratory jurisdiction. Gibbs's first cause of action is dismissed.

IV.     CONCLUSION

For the reasons set forth above, Antarctica's motion to dismiss Gibbs's amended counterclaims and third-party complaint, converted to a motion for judgment on the pleadings, is GRANTED.

The Clerk of Court is directed to close the motions at ECF Nos. 70, 73, 79, 82, and 86.[11]

SO ORDERED.

Dated:      New York, New York
            February 14, 2017

_____
        KATHERINE B. FORREST
        United States District Judge

---

[11] Antarctica's motion to dismiss Gibbs's counterclaim and third-party complaint, and its letter motion requesting oral argument on that motion, were mooted by Gibbs's amended counterclaims and third-party complaint. (ECF Nos. 70, 73.) Gibbs's motion to compel, (ECF No. 82), was resolved by the Honorable Henry B. Pitman.